IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 20, 2006

## DENNIS PYLANT v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Cheatham County**
**No. 13469     Robert E. Burch, Judge**

---

**No. M2005-02721-CCA-R3-PC  - Filed June 29, 2007**

---

The petitioner, Dennis Pylant, appeals the denial of post-conviction relief by the Cheatham County Circuit Court after an evidentiary hearing.  On appeal, the petitioner contends the trial court erred in:  (1) suppressing hearsay testimony; (2)  finding trial counsel effective; and (3) denying relief based on the cumulative effect of the alleged errors.  After careful review, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS  J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined.  JAMES CURWOOD WITT, JR., J., filed a dissenting opinion.

Eric S. Cartee, Nashville, Tennessee, for the Appellant, Dennis Pylant.

Robert E. Cooper, Jr., Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; Dan Mitchum Alsobrooks, District Attorney General; and Robert S. Wilson, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

In 2001, a Cheatham County jury convicted the petitioner of one count of felony murder committed in the perpetration of aggravated child abuse, and the petitioner received a life sentence. The proof at trial showed that, on September 24, 1999, Amanda Davis, the victim's mother, implored a neighbor to call 9-1-1 because she could not wake her two-year old son.  State v. Dennis Pylant, No. M2001-02335-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Nashville, May 8, 2003).  The neighbor testified that he, thus, instructed his father to call 9-1-1, and he entered Ms. Davis's and the petitioner's mobile home and found the victim dead.  Id.

Cheatham County Sheriff's Department Sergeant Floyd Duncan, Jr., testified at trial that he interviewed Ms. Davis and the petitioner after the death was declared a homicide.  Id., slip op. at 3. The petitioner informed him that Ms. Davis was the only other adult with the child that day.  Id.  He

stated that the victim began crying after Ms. Davis left to run an errand at approximately 3:30 or 4:00 p.m. Id. The petitioner further stated that he changed the victim's diaper, but the victim continued to cry. Id., slip op. at 3-4.

Rebecca Pylant, the petitioner's eight-year-old daughter, testified at trial that on September 23, 1999, the petitioner became angry because of the victim's constant crying and that the victim continued to cry after the petitioner changed the victim's diaper. Id. She was in the living room when she heard a noise that "sounded like daddy spanking him," so she walked to the victim's bedroom and observed the petitioner strike the victim twice. Id. Rebecca Pylant further testified that there were no sounds coming from the victim's room after Ms. Davis returned. Id.

On cross-examination, Rebecca Pylant testified that she observed Ms. Davis strike the victim on his lower back with a wooden spoon before she left to run errands on September 23, 1999. Id., slip op. at 6.

Doctor Charles Harlan, who performed the victim's autopsy, testified that he discovered two lacerations of the gastric mesentery which caused the victim to bleed to death. Id., slip op. at 7. He also testified that the victim had red contusions on the back of his midsection. Id.

As defense proof at trial, the petitioner merely entered into evidence the presentment charging Ms. Davis with the victim's felony murder and her plea of nolo contendere to child neglect. Id., slip op. at 8.

The jury convicted the petitioner of felony murder committed in the perpetration of aggravated child abuse, and this court affirmed the conviction. See id., slip op. at 15. The petitioner then filed a timely petition for post-conviction relief, which the post-conviction court denied after an evidentiary hearing.

At the post-conviction hearing, the petitioner called Dr. Bruce Levy, the State of Tennessee's Chief Medical Examiner. Doctor Levy testified that he reviewed Dr. Harlan's autopsy report, his trial testimony, and other forensic evidence regarding the petitioner's case. Doctor Levy testified that he disagreed with Dr. Harlan's conclusion that the injuries to the back caused the tear in the mesentery. In Dr. Levy's opinion, it is not possible for a blow to the back to cause the mesentery tears. He testified that mesentery tears are typically caused from a crushing blow to the front of the body because a front-blow "crushes the mesentery which is a fairly soft structure up against the front of the backbone." Doctor Levy further testified that "[t]he back is a very well protected area[] and would not cause the injury." Doctor Levy testified he would have testified accordingly had he been called as a witness at petitioner's trial.

On cross-examination, Dr. Levy testified that it is not impossible that the blow which caused the tear came from the back, but in his opinion, the tears came from a blow to the front of the body. He testified that Dr. Harlan found a cylindrical mark on the victim's back, and he agreed that the mark could have been made by a palm of a hand. Doctor Levy further testified that, if the victim

-2-

squirmed during the blows, the victim could have been hit in the stomach, causing the mesentery tears.

On redirect examination, Dr. Levy stated that, if the abdomen had been supported, a blow to the back could have caused the injury. He also testified that the marks on the back could have come from a wooden spoon.

However, on recross-examination, he testified that a person could not generate enough force with the wooden spoon to cause the mesentery tears. Doctor Levy further testified that, after losing a certain amount of blood, a person would lose consciousness and then die. He testified that if the victim's tears occurred at 3:30 p.m., then he would be in excruciating pain during the next three hours and could not conduct normal activities.

Lyla Defosio, the petitioner's grandmother, testified that she was present to testify at the petitioner's trial but that she never did. In the post-conviction hearing, she testified, over objection, that after Ms. Davis testified at the preliminary hearing, Ms. Defosio overheard Ms. Davis tell her attorney, "I know I beat him but I didn't aim to kill him; but I know I did." Ms. Defosio testified that she informed the petitioner's attorneys of this admission and that she would have testified to the admission had she been called as a witness at the petitioner's trial.

On cross-examination, Ms. Defosio gave somewhat contradictory, confusing testimony regarding where and when Ms. Davis made this admission. On redirect examination, she testified that she gets confused concerning dates, but she clearly remembered Ms. Davis making the statement.

Leroy Binkley, one of the petitioner's neighbors, testified in the evidentiary hearing that, on the afternoon that the victim was found dead, he observed Ms. Davis burning "small bed sheets" and "kids clothes." He further testified that he told the petitioner's family and "his lawyer at the time." He also testified that he spoke with John Holder of the Cheatham County Sheriff's Department about the incident. Mr. Binkley also testified that he was present at the courthouse for the trial, but he did not remember receiving a subpoena. He stated that, if called to testify at trial, he would have testified about Ms. Davis's activities.

On cross-examination, Mr. Binkley stated that he did not remember being on jury duty that day, and he denied "smoking dope" with the petitioner.

Trina Jackson testified that she worked at Mapco Express with Ms. Davis. On one occasion, she saw Ms. Davis hold the victim up by one of his arms and spank him. She testified that, when Ms. Davis spanked him, his feet came off of the ground. Ms. Jackson did not report this incident to the Department of Children's Services.

Ms. Jackson also testified that she overheard Ms. Davis talking on the telephone while at work after the victim's death. She testified that Ms. Davis said that she could not live with herself

knowing that she had killed the victim. Ms. Jackson did not recall speaking to the petitioner's attorneys about the two incidents, but she had informed the petitioner and Donald Pylant, the petitioner's father. Also, she testified that she received a subpoena to testify at trial on the petitioner's behalf.

Sheila Pylant Wilson, the petitioner's sister, testified that after the petitioner was arrested, Ms. Davis told her that "she had made a deal to get her [other] son back and she was going to lie and do whatever it took to get her son back." Ms. Wilson did not recall the date, but she stated that Donald Pylant and Dorothy Mills were present when Ms. Davis made the statement.

Ms. Wilson further testified that she witnessed Ms. Davis "punch" the victim in the back and call him a "brat." She testified that she observed Ms. Davis hitting the victim on more than one occasion. Ms. Wilson testified that she did confront Ms. Davis about her hitting the victim, and Ms. Davis said that "he won't quit crying; and he was just a brat."

Ms. Wilson testified she did receive a subpoena to testify at trial and that she was interviewed "somewhat" by one of the petitioner's attorneys prior to trial. She also testified that one of the petitioner's attorneys asked her if she would be willing to lie, we surmise, if called as a witness. She testified that when she said "no," the attorney said that "he had nothing more to talk to [her] about." Ms. Wilson also testified that, if called as a witness at trial, she would have testified to the same facts.

Lloyd Harris, the petitioner's bail bondsman, testified in the post-conviction hearing, over objection, that after the petitioner called him to post his bond, he interviewed Ms. Davis prior to the bond posting. He testified that she stated that the petitioner "had nothing to do with" the murder and that "[h]e didn't even touch that child." Mr. Harris said that he notified the petitioner of Ms. Davis's statements, but he did not receive a subpoena to testify at the petitioner's trial. Mr. Harris affirmed that he would have testified to the same facts had he been called as a witness at trial.

Donald Pylant, the petitioner's father, testified that, on the night of the petitioner's arrest, he went to the petitioner's mobile home and saw Ms. Davis putting things into the petitioner's truck. She told him, "I'm the one that did this; but I'm going to have to put the blame off on [the petitioner] if I can where I can try to keep my other baby." Mr. Pylant testified that Ms. Davis made this statement in the presence of his ex-wife, Dorothy Mills, and his daughter. Mr. Pylant further testified that Ms. Davis said the same thing after the first preliminary hearing.[1] Mr. Pylant testified that he reported both incidents to the petitioner's attorneys but did not receive a subpoena to testify at the petitioner's trial. Mr. Pylant also testified that he gave the petitioner's attorneys the names of various individuals who had information regarding the petitioner's case, including Jimmy Anderson, Lyla Defosio, and Trina Jackson. He testified that Mr. Anderson accompanied him to the trial everyday.

---

[1] The court conducted two preliminary hearings because the first hearing was not recorded due to an equipment problem.

Mr. Pylant testified that he attended several meetings with the petitioner and his attorneys. One attorney requested more funds from Mr. Pylant to hire an investigator and a medical examiner. Mr. Pylant testified that he did not have the additional $10,000 requested. At the meeting, the attorneys never advised the petitioner of the felony murder doctrine. He also testified, over objection, that the lead attorney told him after the petitioner's trial, "I'll either do the appeal for you free or I'll sign papers right now that I didn't properly represent [the petitioner]."

On cross-examination, Mr. Pylant reiterated that the attorneys never discussed felony murder, not even when they reviewed the State's plea offer of four years with the petitioner. Mr. Pylant testified that he told the petitioner that he should not accept the State's offer.

Maya Pylant, the petitioner's wife, testified that she and the petitioner have two children and that she was not subpoenaed at trial. Ms. Pylant testified that, if she had been called as a witness at trial, she would have testified that the petitioner was good with kids and that she had never seen him be verbally or physically abusive. In addition, Ms. Pylant recalled that, on one occasion before the petitioner's trial, Ms. Davis followed her and the petitioner. According to Ms. Pylant, Ms. Davis told the petitioner that, if he did not leave with her, she would tell the police that the petitioner had killed the victim.

Dorothy Mills, who had been married to the petitioner's father, testified that she witnessed Ms. Davis throw the victim into a car "from the passenger's side to the driver's side of the car." Ms. Mills further testified that, after the first preliminary hearing, Ms. Davis said that she had killed the victim and was going to place the blame on the petitioner. Ms. Mills and Ms. Davis became embroiled in a fight. Ms. Mills was charged with assault, but the charge was dismissed. Ms. Mills further testified that she told lead counsel of the incidents.

Brent Spurlock, who worked with the petitioner as a painter, testified that, one morning after the trial, he and the petitioner met at a market before work. He saw Ms. Davis drive into the market's parking lot and summon the petitioner to her car. He never saw her afterwards. He also testified that he received a subpoena to testify at the petitioner's trial.

The petitioner testified that he retained his trial attorneys by signing over the deed to his land and the title to his mobile home. He stated that he supplied counsel with a written list of potential witnesses' names, including addresses and telephone numbers. We discern from the record that the list included the following people: Lyla Defosio, Leroy Binkley, Trina Jackson, Sheila Pylant Wilson, Lloyd Harris, Donald Pylant, Maya Pylant, Dorothy Mills, Brent Spurlock, Teresa Portillo, Jimmy Anderson, and June Hargrove. The petitioner stated that the attorneys refused to subpoena some of the witnesses, for example, Lloyd Harris. He testified that some witnesses offered to give depositions, but none were taken. He further testified that lead counsel informed him that he had subpoenaed 12 witnesses, but lead counsel refused to name the 12 because "he was not going to discuss courtroom strategy." The petitioner testified that, if he had known that lead counsel was not

going to call his witnesses, then he would have accepted the State's offer to plead to reckless homicide, with an agreed sentence of three years at 30 percent.[2]

The petitioner testified that he remained in jail for five months after his arrest before posting bond. After he posted bond, he became employed, but he was still unable to raise the additional $10,000 for his attorneys to hire an investigator and a medical expert. He testified that he had no extra cash and owed friends and family for posting his bail. The petitioner further testified that, prior to trial, he had never heard of being declared indigent.

During a discussion with lead counsel about the State's plea offer, counsel told the petitioner that, to establish first degree murder, the State would have to prove that the killing was "intentional," "willful, deliberate, and premeditated." He further testified that, when he read the plea offer, he asked why it said "felony first degree murder." The petitioner testified that lead counsel replied, "[W]hat did you think this was a misdemeanor charge[?]"

Also regarding the State's plea offer, the petitioner testified that he told lead counsel he would sign the agreement if the wording was changed to reflect a plea of "no contest or best interest." He testified that when he arrived at lead counsel's office to sign the agreement, lead counsel talked him out of it, stating that the State lacked the evidence to convict him of first degree murder and that he should "ask for all or nothing."

The petitioner testified that he had never heard of the felony murder doctrine and did not receive a copy of the indictment. He testified that his attorneys did not explain that, to prove felony murder, the State "only needed to prove an inlaying [sic] felony to convict [him]." Furthermore, he testified that, when he sent a letter to lead counsel asking why he mentioned felony murder in the appellate brief, lead counsel's reply letter stated that felony murder and first degree murder were one in the same without further explanation.

On cross-examination, the petitioner testified that he did not take legal advice from his father and that lead counsel persuaded him to reject the plea offer. He agreed that at one point, lead counsel had counseled him to accept the State's offer. The petitioner did not remember lead counsel showing him pattern jury instructions or explaining the elements of felony murder. The petitioner admitted that, during the trial, he heard the term "felony murder," but he thought it referred to the fact that every murder was a felony.

_____

[2] The petitioner first testified that trial counsel "told [him] that the state was offering five years probation," but he never saw the offer in writing. He then testified to the referenced offer, which he saw in writing. We note that a Notice of Proposed Plea Agreement and Declination of Same was entered as an exhibit at the post-conviction hearing. It stated that the plea offer was to plead guilty to reckless homicide and be sentenced to four years, the manner of service to be determined by the trial court. However, a line crossed through the word "guilty," and "no contest or best interest" was handwritten onto the document. Also, "(4)" was marked through and "3" was written above it.

The petitioner further insisted that he told lead counsel to call Ms. Davis as a witness, but lead counsel did not want to call her to testify. The petitioner said that he did not testify at trial based upon counsel's advice.

The petitioner testified that Rebecca Pylant's story got worse as the trial date approached. He testified that she actually heard him clap his hands to get the victim's attention when he entered the victim's bedroom. He stated that Rebecca Pylant saw him help the victim to his feet after changing his diaper and saw him "pat [the victim] on the butt."

Teresa Portillo, Ms. Davis's biological mother, testified at the post-conviction hearing that she received a defense subpoena, but she was never told why. She did not recall telling anyone that she attended the trial to make sure an innocent man did not go to jail. Ms. Portillo testified that she did not recall seeing her daughter ever strike the victim, and she did not remember making allegations to the Department of Children's Services regarding abuse by Ms. Davis.

The State called lead counsel as its only witness. He testified that he had handled several homicide cases and that he explained the felony murder charge to the petitioner using the warrants in the case and the pattern jury instructions. He further testified that it was his common practice to send a copy of all court documents to his clients.

Regarding the State's plea offer, lead counsel testified that the petitioner rejected it and signed a form, stating that he declined the offer. Lead counsel was "very sure" that he discussed the elements of the offense with the petitioner at this time. He disputed the accuracy of the petitioner's testimony that he never discussed the felony murder doctrine.

Lead counsel testified that he filed numerous motions in the case, including one requesting that no lesser included offenses be charged to the jury. Lead counsel explained his strategy of "going all or nothing" because it was allowed in a "Massachusetts case."

Lead counsel testified that in two preliminary hearings, he had the benefit of questioning State witnesses, including Ms. Davis and Dr. Harlan. He testified that, in addition, he had Dr. Harlan's autopsy report and a transcript of Rebecca Pylant's interview with police. Lead counsel had originally wanted to hire an independent medical expert to pinpoint the victim's time of death, but after talking with Dr. Harlan, he learned that the time of death could not be conclusively pinpointed. Thus, he decided that a defense expert was not needed because there "wasn't a dispute about the manner of death."

Lead counsel admitted that the petitioner gave him a list of potential witnesses, but he further testified that "[a]ny witness [the petitioner] would have told me about specifically that he even had a fact of the case, we would have interviewed or called . . . ." Lead counsel testified that he and co-counsel met with the petitioner and "voted" on whether Ms. Davis would be called as a witness. Lead counsel "voted to call her" because he had a "wealth of cross-examination information about

her" and could use prior bad acts to impeach her; however, co-counsel and the petitioner out-voted him and decided not to call her as a witness.

On cross-examination, lead counsel maintained that many of the petitioner's potential witnesses would have testified to irrelevant information. The petitioner, moreover, did not insist on any particular witnesses testifying. Lead counsel considered at one point having the petitioner declared indigent and asking for additional funds. Counsel reconsidered and did not do so, however, after speaking with Dr. Harlan. He further testified that the defense theory was that Ms. Davis killed the victim. He admitted that he was aware of her prior inconsistent statements and prior bad acts, but he defended the decision not to call her as "a vote by committee."

On redirect examination, lead counsel denied discouraging the petitioner from taking the plea offer. He reiterated that the petitioner's potential witnesses "had no relevant or probative value whatsoever." Furthermore, he described the decision not to call Ms. Davis as a witness as trial strategy.

After all testimony, the State moved, via a written motion, to strike all hearsay testimony given in the evidentiary hearing regarding alleged admissions made by Ms. Davis. The court informed the parties that it would decide the issue in its written opinion.

In its written opinion, the post-conviction court first addressed the motion to strike. It granted the State's motion because, under Tennessee Rule of Evidence 804(b), a statement against penal interest is admissible as a hearsay exception only if the declarant is unavailable. The post-conviction court stated, "Petitioner has not shown Amanda Davis[, the declarant,] to be unavailable for the Post-Conviction hearing, in fact, the proof establishes that she is was available." The court also stated that it could not speculate on the reliability of Ms. Davis's statements. The court ruled that the testimony about Ms. Davis's statements was inadmissible in the post-conviction hearing and granted the State's motion to strike the testimony concerning Ms. Davis's admissions.

Regarding trial counsel's failure to interview potential witnesses and view evidence, including videotaped witness statements, the post-conviction court found that many of the witnesses presented at the post-conviction hearing testified to the inadmissible statements made by Ms. Davis. The court stated that it would not consider this testimony. Further, the court found that Mr. Binkley's testimony that he saw Ms. Davis burn sheets and children's clothing, Ms. Jackson's testimony that she saw Ms. Davis spank the victim with her hand, Ms. Wilson's testimony that she saw Ms. Davis hit the victim with the heel of her hand, and Ms. Mills's testimony that she saw Ms. Davis throw the victim into a car would not have affected the outcome of the trial. The court further stated that the petitioner failed to show how trial counsel's failure to investigate prejudiced him.

The post-conviction court also found, regarding trial counsel's failure to retain a medical expert, that the petitioner failed to show that Dr. Levy's testimony would have changed the result. Moreover, the post-conviction court found that the petitioner failed to show prejudice from counsel's failure to obtain an expert.

-8-

The post-conviction court rejected the petitioner's and his father's testimony regarding the allegation that counsel failed to discuss the charge and its elements. The court found that counsel's testimony was truthful in that he did discuss the information with the petitioner. Thus, the post-conviction court stated that counsel gave the petitioner proper advice and that the petitioner failed to establish, by clear and convincing evidence, that counsel failed to inform him of the charge.

Regarding counsel's failure to call the witnesses presented at the post-conviction hearing, the court found that the petitioner failed to show that these witnesses would "have offered admissible testimony which could have altered the outcome of the case." Therefore, the petitioner failed to show that counsel was ineffective.

The post-conviction court also found that counsel acted within the scope of competency by relying on the State court system's devices for recording proceedings, in this case the first preliminary hearing, and not bringing his own recording device. Thus, counsel was not ineffective in this regard.

The post-conviction court did find that counsel failed to file with this court a transcript of the hearing on the petitioner's Motion for Bill of Particulars. However, the petitioner failed to show that this motion was meritorious, and thus, he failed to show this failure prejudiced him.

Finally, the post-conviction court found, regarding petitioner's claim that his trial was fundamentally unfair, that the petitioner "received a fair trial."

On appeal of the denial of his petition for post-conviction relief, the petitioner in essence raises the following issues:
1) Whether the post-conviction court erred in striking testimony that the victim's mother admitted committing the crime;
2) Ineffective assistance of counsel
   a) Failure to hire a forensic expert
   b) Failure to call the victim's mother as a witness;
3) Failure to inform the petitioner as to the charges he was facing and the elements of the crime of felony murder; and
4) Whether the post-conviction court erred in denying relief based on the cumulative effect of the errors committed.

<u>Analysis</u>

**I. Alleged Hearsay Testimony**

On the final day of the post-conviction hearing, the record reflects that the State moved to strike statements made by the petitioner's witnesses about statements allegedly made by the victim's mother following the death of the victim. The court ruled on the motion in its final order. The petitioner contends that this is "clear error." During the course of the hearing, the State

contemporaneously objected to the testimony as it was made based on hearsay. However, the post-conviction court overruled these objections at the time based on petitioner's counsel's argument that the statements were being offered to prove something other than the truth of the statements. The petitioner contends that, had the post-conviction court sustained the hearsay objections at the time, he would have been able to call the declarant to testify. Further, on appeal, the petitioner contends that the statements fall under Tennessee Rule of Evidence 803(3) as exceptions to hearsay because they were statements of the declarant's then-existing state of mind.

The State argues that it simply renewed its objection to the testimony as is permissible and that the post-conviction court properly sustained the motion and excluded the hearsay testimony from consideration. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid 801(c). Hearsay is not admissible at trial unless it fits within a recognized exception. Tenn. R. Evid. 802. Tennessee Rule of Evidence 804(b)(3) provides that "[a] statement which was at the time of its making. . .tended to subject the declarant to civil or criminal liability. . .that a reasonable person in the declarant's position would not have made the statement unless believing it to be true" is not excluded by the hearsay rule if the declarant is unavailable as a witness.

For a witness to be unavailable, he or she must fall within one of six categories as provided by Tennessee Rule of Evidence 804(a)(1-6). Here, there was no showing that the declarant was unavailable; in fact, the post-conviction court found that she was present in the courthouse and located in the witness room during the post-conviction hearing. The proof established that the declarant was available as a witness. The State argues, and we agree, that the testimony the petitioner wanted the post-conviction court to consider was the very definition of a statement against interest. Because the statements constituted statements against the penal interest of the victim's mother, the burden was on the petitioner to show that she was not available to testify, and he failed to meet his burden. Therefore, the post-conviction court properly excluded the hearsay testimony.

Assuming arguendo that the statements were not hearsay and that they were offered not for the truth that the declarant claimed responsibility for the killing but to show that counsel knew about other witnesses and should have called the proffered witnesses to testify as to their knowledge, the statements are not helpful to the petitioner's case. The statements would not have been allowed at trial. They would have been hearsay at trial and, therefore, inadmissible without a showing that the declarant was unavailable. For a petitioner to successfully overturn a conviction based on ineffective assistance of counsel, the petitioner must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523, S.W.2d 930, 936 (Tenn. 1975). Second, the petitioner must show that the deficiencies "actually had an adverse effect on the defense" and prejudiced the petitioner. Strickland v. Washington, 466 U.S. 668, 693, 104 S. Ct. 2052 (1984). If the statements would not have been admissible at trial, the petitioner cannot show that he was prejudiced by counsel's failure to call those witnesses at trial. Therefore, even if the post-conviction court erred in finding the testimony was hearsay, any such error would have been harmless because the petitioner could not show that he was prejudiced by counsel's failure to have the statements admitted at trial. If the statements would not have been

admissible at trial, the petitioner cannot obtain post-conviction relief because he cannot show prejudice.

## II. Ineffective Assistance of Counsel

Next, the petitioner contends that he received ineffective assistance of counsel in three areas. First, he contends that counsel's representation was deficient because counsel did not call the victim's mother as a witness at trial. Second, he argues that counsel should have hired an expert to testify at trial. Third, the petitioner claims that counsel did not adequately advise him of the charges he faced nor did he adequately advise him of the elements of felony murder. We will address each contention separately.

### A. Failure To Call The Victim's Mother To Testify

The petitioner contends that counsel rendered ineffective assistance in failing to call the victim's mother to testify at trial. He argues that she was responsible for the killing of the victim and that she should have been called to answer regarding her involvement in the death and her statements in the aftermath of the incident. However, he did not call her to testify during the post-conviction proceeding. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); see also Scott v. State, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996). As a general rule, this is the only way the petitioner can establish that: (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness resulted in the denial of critical evidence which caused the petitioner prejudice. Black, 794 S.W.2d at 757. Neither the trial court nor this court can speculate on what a witness's testimony might have been if introduced by counsel. The petitioner's failure to call the victim's mother as a witness at the post-conviction hearing precludes our review of this issue. The petitioner's failure to present the testimony of the proffered witness also prevents him from demonstrating how her missing testimony prejudiced him at trial. We may not speculate as to what the proposed witness would have said; therefore, we may not address the issue in the absence of her testimony.

### B. Failure To Call An Expert Witness

The petitioner contends that counsel erred in failing to reasonably investigate the need for a forensic expert and that the decision to proceed without such expert was "ignorant, uninformed and unreasonable." The post-conviction court found that the petitioner failed to show at the post-conviction hearing that his expert's testimony would have changed the outcome of the petitioner's trial. The post-conviction court also found that the petitioner failed to show prejudice as a result of counsel's failure to obtain an expert. We agree with the post-conviction court.

The petitioner's expert, Dr. Levy, did not testify contradictory to the trial testimony of the

State's expert. Although the petitioner's expert disagreed with the conclusion of the State's expert that the fatal injury was caused by a blow to the victim's back, he admitted that it was possible that this injury could have been caused in that manner. In addition, the testimony of the petitioner's expert was not consistent with the petitioner's defense that the victim's mother administered the fatal blow with a wooden spoon because he testified that a wooden spoon could not generate enough force to cause the fatal injury. Moreover, the petitioner's expert further testified that, if the victim's mother had administered the fatal blow at approximately 3:00 to 3:30 p.m., as testified to by the petitioner's daughter, the victim would then have been in excruciating pain by 6:00 to 6:30 p.m. and unable to "engage in normal activity." The proof at trial showed that the victim did engage in normal activity during that time frame.

The testimony of the State's expert at trial was such that the defendant had a possible twelve-hour window in which other adults were around the child. During this window, the child was in the care and custody of other adults such that someone other than the defendant could have inflicted the injuries. The petitioner's expert, on the other hand, narrowed the time frame such that the fatal blow was administered during the time period in which the defendant alone was given care, custody, and control of the minor child. The petitioner's expert's testimony left little room for anyone else to be involved. Thus, the petitioner failed to show how his counsel was deficient and failed to show how he was prejudiced on this claim.

### C. Failure To Properly Inform The Petitioner Of The Charge And Its Elements

Finally, the petitioner claims that his trial attorneys were ineffective for failing to inform him of the felony murder elements. He contends that, had he been properly informed, he would have accepted the State's plea offer. The post-conviction court rejected the petitioner's argument and the testimony of the petitioner and his father regarding the allegation that counsel failed to discuss the charge and its elements. The court found that trial counsel's testimony was truthful in that he did discuss the information with the petitioner. The post-conviction court stated that counsel gave the petitioner proper advice and that the petitioner failed to establish, by clear and convincing evidence, that counsel failed to inform him of the charge.

The post-conviction court accredited trial counsel's testimony that he did inform the petitioner of the charge against him. Therefore, we hold that the petitioner has failed to meet his burden.

### III.    Denial Of Relief Based On The Cumulative Effect Of The Errors Committed

The petitioner's final issue is a "catch all" issue that the post-conviction court erred in denying post-conviction relief based on the cumulative effect of the errors. The State argues that the petitioner is not entitled to relief based on cumulative error. We agree. We have found no prejudicial error in any of the issues raised by the petitioner and, therefore, conclude that he is not entitled to relief. The State argues, and we agree, that this issue is redundant because the petitioner has merely resubmitted the issues he previously presented. This issue is without merit.

## Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment from the post-conviction court in all respects.


_____
JOHN EVERETT WILLIAMS, JUDGE